Heath *v.* Williams.

## CHARLES HEATH *versus* JOSEPH WILLIAMS.

In trespass *quare clausum*, where the plaintiff is in possession of the land, and brings his action for an injury thereto, and on the trial each party sets up title to the land, the burthen of proof is on the defendant to make out, that the title is in himself. If each party shows an independent title thereto precisely equal in strength to that of the other, the defendant fails.

Priority of appropriation of the water of a stream confers no exclusive right to the use of it. A riparian proprietor who owns both banks of a stream, has a right to have the water flow in its natural current, without any obstruction injurious to him, over the whole extent of his land, unless his right has been impaired by grant, license, or an adverse possession for more than twenty years.

The common law affords the owner of land a protection against the flow of water back upon his own land to the injury of his mill by the acts of another, without showing any priority of appropriation, or statute provision to aid him. And failing to obtain relief from the continuance of such an injury without it, he may lawfully enter upon the land of the person causing the injury, and remove, so far as necessary, the obstruction which occasioned it; unless his title to the water power which he claimed should prove to be defective, or his full right of use should prove to be impaired.

A mortgagee, while he permits the mortgagor to retain the possession, can have no just cause to interfere, or to complain, if the mortgagor be found making improvements upon the estate; and his rights cannot be impaired by his neglect to do so.

While one continues to occupy land as the tenant of another, he will not be permitted to deny the title of his landlord; but after that relation ceases to exist, his rights to the land are not impaired thereby.

THE action was trespass *quare clausum*, and was referred by a rule from this Court to a referee, who made a general

report, that the plaintiff had not sustained his action, and that the defendant should recover costs of Court and costs of reference. The referee then proceeded as follows. No copy of the plan, or of either of the deeds referred to in the report, was found among the papers which came into the hands of the reporter.

The plaintiff's counsel having specially requested that the legal points arising in this suit may be presented for the determination of the Court, the following exhibit of the case is hereby presented.

This is trespass *quare clausum.*

The plaintiff owns a lot of land, and claims that it is the lot colored red on the plan. But its southern boundary is disputed by defendant.

The strip in controversy is painted *yellow* on the plan. The defendant is in possession of the south lot, claiming it as his own. The dividing line was brought into question. There was much testimony. The plaintiff proved his title by evidence which seemed incontrovertible. The defendant proved his, by evidence equally satisfactory and convincing. The proofs were so balanced, that the referee had no other means of deciding which of the parties owned the " disputed territory," than by resorting to the inquiry, " *on whom rested the onus probandi?*" This he supposed to be on the defendant, and the result was, that he decided defendant had not proved his title. If, in law, the onus is on the plaintiff, then the plaintiff has failed to prove his right to the strip.

The means which the Court will have for deciding this point will appear hereafter.

Upon the foregoing grounds, the referee proceeded to examine the other part of the case, acting on the assumption that the plaintiff owned the debatable strip, and it will hereafter be spoken of as being a part of plaintiff's lot.

Plaintiff owns a tannery mill, which with its flume and the western end of the dam, are on his own land. Eastern end of the dam is on defendant's lot. This mill and dam were built between 1829 and 1833.

A removal by defendant of the part of the dam which stands on his land would destroy the use of plaintiff's mill.

Defendant has a clothing mill on the stream above plaintiff's dam. It is fed by a dam, which with its predecessor on the same site has stood more than 20 years, prior to the alleged trespass. There has been no abandonment of this privilege.

In the summer of 1842, the parties were operating their respective mills. Plaintiff permitted the water, held by his dam, to rise so high as seriously to impede the operation of defendant's mill. Defendant frequently requested plaintiff to let the water off, so that the back-flow should not injure him. This was not done. Defendant notified plaintiff that he should let the water off, by hoisting plaintiff's gate or in some other way, unless plaintiff himself should do it. But plaintiff forbade him to do so. Defendant for that purpose undertook to hoist plaintiff's gate, but was not able to. He thereupon removed two or three planks from plaintiff's flume, and let the water off, doing no greater damage than was necessary to remove the back-flow from his mill. That act is the trespass sued for in this action.

To justify that act, defendant relied on his title, as above mentioned, to the land on which the flume stands; and the flume stands on the disputed strip. As above stated, the referee considering the onus of proof to be on defendant, decided that point against him. If the onus was on plaintiff that point is to be decided against *him.*

Defendant next contended that, as his mill and dam were the oldest he had a right of priority to the water, and might lawfully break the flume as he did.

Referee was of this opinion, unless the legal principle was controlled or rendered inapplicable by other considerations belonging to the case.

Plaintiff thereupon contended, that as he owned the land on which defendant's dam was built, he might remove that dam, and in that way destroy the use of defendant's mill; and that if he might destroy that use in *that mode,* he might also do it by back-flowing from the lower dam; inasmuch

as it must be quite immaterial to defendant, by which of two modes the damage to his mill should happen.

If this should be conceded as a true principle, the referee thought it might be difficult to sustain this action; because *defendant* by removing that part of the *lower* dam, which is on *defendant's* land, might in like manner defeat *plaintiff's* mill. And as to the mode of producing that effect, it could make no difference to plaintiff whether it was done by defendant's removing the portion of the dam which is on defendant's land, or by breaking the flume, as was in fact done.

There may possibly be some question how much, if any, of the upper dam is on the plaintiff's land. His deed makes his west line to run *fifteen rods*, to the stream, thence by the north line of the south (defendant's) lot, to the starting point. By the plan it appears that said west line, whether it stop at the margin of the stream, or at its centre, or be continued to any other point, in the same direction, will not strike said north line of the south lot, by several rods.

Very probably, however, the construction of the deed may be such as to make plaintiff's west line pass down by the centre of the stream, so as to strike said north line in that direction.

Such a construction would place the east half of the upper dam on plaintiff's land, and, (unless for its antiquity,) he might be justified in removing it.

On this hypothesis, plaintiff might by removing his part of the *upper* dam impede the use of defendant's mill. Could he therefore, lawfully, impede it by back-flowing from the *lower* dam ?

In this connection, the antiquity of the upper dam is to be taken into the account.

Plaintiff denies defendant's title to the south lot and claims that he is the owner.

It was mortgaged in 1829. The mortgagor conveyed his right to Spaulding in 1831, by a deed of quit-claim, duly recorded. The mortgagor had the possession, and Spaulding continued in possession for a few years, by the mortgagor under him.

In 1831, Spaulding purchased (adjoining) north lot of the *mortgagee.* Thus the *possession* of both lots was united in Spaulding. The dam was built while that possession continued, the mortgagee being present and making no objection. Between 1835 and 1837, the mortgagee hired and used plaintiff's mill, under Spaulding's assignee.

In 1835, the mortgagor, notwithstanding his conveyance in 1831 to Spaulding, relinquished in writing on the back of the mortgage, to the mortgagee his right of redeeming, and, for that consideration solely, the mortgagee gave up to him the notes then due, no part of which has ever been paid. There were four notes, the last of which became payable in 1833. At the same time (1835) the mortgagor, who till then had occupied both lots, under Spaulding, left the town, and the mortgagee went into possession and occupation of the mortgaged lot, and he and those claiming under him have continued that possession and occupation to the present time.

Defendant has the mortgagee's title; plaintiff has all the rights which belonged to Spaulding in both lots.

The mortgagee never gave any discharge of the mortgage, other than by giving up the notes to the mortgagor in manner above stated. No one claiming under Spaulding has brought any bill in equity or other process, to obtain possession of the upper lot. Defendant contends, that the giving up of the notes under those circumstances did not defeat the mortgage, and that, as the mortgagee went into actual possession of the mortgaged lot in 1835, (which was after the pay day of the notes,) the mortgage was foreclosed in 1838; or at least that he, the defendant, being the assignee of the mortgagee, and being in actual possession, is to be deemed to hold that possession rightfully, as against the plaintiff who is the assignee of the mortgagor.

On the other hand, the plaintiff insists that, as he is the assignee of the mortgagor, who after his assignment took up the notes as aforesaid and destroyed them, the mortgage became inoperative and void, so that plaintiff's title became perfect.

The referee held, that the mortgage was not defeated by the

acts of 1835, the notes never having been paid; and that defendant's possession of the upper lot was rightful. Plaintiff contended, from the abovenamed unity of possession, and, the mortgagee's acquiescence in building the dam partly on the mortgaged lot, and his subsequent hiring of the plaintiff's mill, which is fed by that dam, it results in law, that the plaintiff's mill is entitled to the prior right of the water.

The referee held otherwise, on the ground that the dam was built on the mortgaged lot by those who were in possession under the *mortgagor* as they might lawfully do. But that when the mortgagee afterward took posession, he took it freed from all arrangements made by the mortgagor, &c. And that the hiring of the plaintiff's mill, for a year or two by the mortgagee could not operate such a grant or license to continue the dam, as would take away from defendant, his priority to the right of water.

The following documents are to be referred to. The Plan. Deed, Potter & al. to Small, 1829. Mortgage back of same date. Small to Spaulding, 1831. Potter to Spaulding. 1831. Spaulding to Otis, 1835. Potter to Small, 2d, 1841. Small, 2d to defendant, 1842. Otis to plaintiff, 1842.

The referee's intention was, upon the foregoing facts and the documentary evidence, to decide the action on legal principles.

If the Court shall be of opinion the above written award is in accordance with those principles, the said award is to stand.

If the Court, however, shall think the plaintiff entitled to recover, the award is hereby made that the plaintiff recover the sum of $25, damage, and costs of Court to be taxed by the Court and costs of reference.

Full and able arguments in writing were furnished to the Court by

*Otis*, for the plaintiff — and by

*G. W. Batchelder*, for the defendant.

The opinion of the Court was drawn up by

SHEPLEY J. — This is an action of trespass *quare clausum*, brought to recover damages for an injury done to the flume

leading water to the plaintiff's tannery. The defendant admitted, that he removed some planks from it to let the water run off, and contended, that he had a legal right to do so ; first, because the flume was upon his land ; and secondly, because the plaintiff's mill dam caused the water to flow back upon the wheel of his clothing mill, situated on a branch of the same stream.

The action was referred to the Judge of the Middle District Court, who made a report against the plaintiff's right to maintain the action. He also presented with his report certain deeds of conveyance, facts, and questions of law, for the consideration of this Court, and an alternative report in favor of the plaintiff, if the Court should be of opinion, that he was entitled to recover.

The report states, that the plaintiff's dam caused the water to flow back so much as to seriously impede the operation of the defendant's mill ; and that he, after requesting the plaintiff to let the water flow off, so that it would not injure him, removed the planks from the flume, doing no greater damage, than was necessary to remove the water, which was injurious to his mill. The plaintiff owned a lot of land, and contended, that it extended southerly so far as to embrace the land, on which his flume had been built. The defendant claimed to be the owner of a lot of land adjoining it on the southerly side, and contended that his land extended northerly so far as to include the land under the flume. The referee, without a detail of the testimony introduced before him to establish their respective claims, states, that " the proofs were so balanced, that the referee had no other means of deciding, which of the parties owned the disputed territory, than by resorting to the inquiry, on whom rested the *onus probandi.* That he supposed it to be on the defendant, and the result was, that he decided, that the defendant had not proved his title." The counsel for the defendant insists, that this conclusion was incorrect. The plaintiff appears to have been in possession of the land, on which the flume was erected, for several years. That possession was sufficient to enable him to maintain his

action against any one, who could not show a superior title, or some legal right to enter upon it. The defendant, failing to show a superior title, could not justify his acts on the ground, that the flume was upon his land.

The report further states, that "defendant has a clothing mill on the stream above plaintiff's dam. It is fed by a dam, which, with its predecessor on the same site, has stood for more than twenty years prior to the alleged trespass." That the plaintiff's dam and mill were built between the years 1829 and 1833. That the defendant next contended "that as his mill and dam were the oldest, he had a right of priority to the water, and might lawfully break the flume, as he did. Referee was of this opinion, unless the legal principle was controlled or rendered inapplicable by other considerations belonging to the case."

The cases cited in the arguments of counsel decide, that priority of appropriation of the water of a stream confers no exclusive right to the use of it. A riparian proprietor, who owns both banks of a stream, has a right to have the water flow in its natural current without any obstruction injurious to him over the whole extent of his land, unless his rights have been impaired by grant, license, or an adverse appropriation for more than twenty years. The defendant appears to be the undisputed owner of the land on both banks of the stream below his mill nearly or quite to the plaintiff's dam, unless that title shall prove to be defective in the manner hereafter stated. While it is contended, that the plaintiff's "dam and mill were erected with such knowledge and concurrence of the defendant's grantors as amounted to a license," it is not contended, that he has acquired any right by grant or by an appropriation for more than twenty years to cause the water to be flowed back upon the defendant's mill. It is not necessary to decide, whether the defendant had acquired a right to have the water of the stream so used as to prevent its being thereby flowed back upon his mill by an appropriation of it without such an occurrence for more than twenty years, as decided in the case of *Saunders* v. *Newman*, 1 B. & Ald.

258. Although he could not derive any right from the statute, c. 126, § 2, or from priority of appropriation, yet the common law would afford him sufficient protection against the flow of water back upon his own land to the injury of his mill by the acts of another. Failing to obtain relief from the continuance of such an injury without it, he might lawfully enter upon the land of the plaintiff, and remove, so far as necessary, the obstruction, which occasioned it; unless his title to the water power, which he claimed, should prove to be defective, or his full right of use should prove to be impaired.

The plaintiff attempts to set up a title in himself, or in another, to the lot of land occupied by the defendant. He then claims to be the owner of the dam, from which the defendant's mill derives its supply of water; and therefore infers, that he had a right to deprive him of the use of it.

The facts in relation to the title and the alleged license appear to be these. Amos Potter and Robert Ashford, on July 6, 1829, conveyed by a deed, recorded on March 3, 1831, the southerly lot now occupied by the defendant, to William Small, who on the same day reconveyed it to them in mortgage to secure the purchase money; and on February 22, 1831, conveyed all his interest in it to Calvin Spaulding. Amos Potter conveyed on May 16, 1831, the northerly lot now owned by the plaintiff, to Calvin Spaulding, who entered into possession of both lots and occupied them by his tenants until the year 1835, when Small, who had continued to occupy under Spaulding, executed a release, written on the back of the mortgage to Potter and Ashford, of his right to redeem the southerly lot; and Potter, without any other payment of them, delivered to him the notes given for the purchase money and secured by the mortgage, and entered into possession of the lot. The plaintiff's dam and mill were erected, while Spaulding was thus in possession of both lots, Potter "being present and making no objection." After the mill was built, and prior to the year 1837, Potter hired it and occupied it under Spaulding, who had conveyed both lots to John Otis, on December 26, 1835, by deed recorded on October 11, 1842.

John Otis, on June 6, 1842, conveyed the northerly, but not the southerly lot, to the plaintiff, whose assertion of title to the southerly lot appears to have been made without any foundation. Until Otis, or some person deriving title from him, shall claim that lot on the ground, that the proceedings between Potter and Small amounted to a payment of the mortgage debt, the defendant must be considered as legally entitled to hold it as assignee of the mortgagee. But as he failed before the referee to establish his title to the northerly bound and line, to which he claimed, he must be considered as failing to establish that line in such a manner as to include within the bounds of his lot the dam, from which his mill derives its supply of water. For the present purpose, that dam may be considered as within the bounds of the plaintiff's lot. The conveyance from Potter and Ashford to Small, from whom the defendant derives his title, contained this clause; " and also the privilege of flowing land and erecting dams on any of the adjoining lands, as much as is necessary for the benefit of machines and mills on the premises." This was quite sufficient to entitle Small and those claiming the same title and rights from him, as the defendant does, to maintain that dam to flow the water for the use of the mill. Spaulding, by his subsequent conveyance from Potter, must take his title subject to that right. The plaintiff, deriving his title from Spaulding, can have no superior right, and cannot resist the right of the defendant to obtain a supply of water for the use of his mill.

With respect to the asserted license, it is only necessary to remark, that a mortgagee, while he permits the mortgagor to retain the possession, can have no just cause to interfere or to complain, if the mortgagor be found making improvements upon the estate. His rights cannot be impaired by his neglect to do so. While Potter continued to occupy the plaintiff's mill as the tenant of Spaulding, he could not be permitted to deny the title of Spaulding. After that relation ceased to exist, his rights would not thereby be impaired. The rights of Potter to the water connected with the southerly lot, do not appear to have been impaired by any of these transactions,

and those rights have been conveyed to the defendant. The report of the referee in his favor is accepted.